IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LAURENCE E. WALDRON,

        Plaintiff,

vs.                                                              No. CIV 01-0977 BB/LCS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 6), filed February 1, 2002. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits. The United States Magistrate Judge, having considered the Motion, memoranda, administrative record, and applicable law, finds that the motion is not well-taken and recommends that it be **DENIED**.

### PROPOSED FINDINGS

1.      Plaintiff, now fifty years old, filed an application for disability insurance benefits on June 9, 1998, alleging disability since May 16, 1998 due to hypertension, diabetes, coronary artery disease, full-blown AIDS, heart disease, heart attack, and progressive visual degeneration. (R. at 60-74.) He has a high school equivalency diploma and past relevant work as a book and video retail clerk and hotel desk clerk. (R. at 52-53; 77.) Plaintiff was forty-seven years old in June 1998, the date his disability insured status expired. (R. at 70.)

2. Plaintiff's application for disability insurance benefits was denied at the initial level on November 23, 1998, (R. at 42), and at the reconsideration level on January 4,1999. (R. at 47.) Plaintiff appealed the denial of his application by filing a Request for Hearing by Administrative Law Judge (ALJ) on January 13, 1999. (R. at 50.) The ALJ held a hearing on October 20, 1999, at which Plaintiff appeared and was represented by a non-attorney. (R. at 20.) Plaintiff and his home health care worker, Leroy Zika, testified at the hearing. (*Id*.)

3. The ALJ issued his decision on April 27, 2000, analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). (R. at 10-15.) The ALJ determined that Plaintiff met the disability insured status requirements through June 1998. (R. at 11.) At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (*Id*.) At step two, the ALJ determined that Plaintiff had the severe impairments of HIV infection, diffuse coronary artery disease, and diabetes, but that his depression was not severe during the period under consideration. (R. at 11-12.) At step three, the ALJ found that the severity of Plaintiff's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (R. at 12.) The ALJ then determined that Plaintiff had the residual functional capacity (RFC) for the full range of sedentary work, and at step four, the ALJ determined that Plaintiff's RFC was insufficient to perform his past relevant work. (R. at 13.) At step five, relying on the Medical-Vocational Guidelines[1] (Grids), the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 14.)

---

[1] 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2).

4. On May 12, 2000, Plaintiff filed a request for review of the ALJ's decision. (R. at 6.) On July 24, 2001, the Appeals Council denied the request for review. (R. at 4-5.) Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On August 27, 2001, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5. The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

6. In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (*citing* 42 U.S.C. § 423(d)(1)(A)). The Commissioner has established a five-step sequential evaluation process to aid in the disability determination. 20 C.F.R. § 404.1520. At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work

activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

**Administrative Record**

7. On January 8, 1997, Plaintiff was evaluated at the Albuquerque Veterans Administration Hospital (VA) by Dr. E. Clark, M.D. (R. at 141.) Plaintiff complained of back pain, problems walking, and difficulty getting out of chairs. (*Id.*) Plaintiff's gait was normal, Rhomberg signs were negative, and range of motion at the waist was good. (*Id.*) Plaintiff appeared stiff standing up and had mild back discomfort. (*Id.*) An MRI revealed hypertrophy of the spine at C3-C4 and C4-C5 with neuroforminal narrowing and disc space loss at L4-L5, L5-S. (*Id.*) Dr. Clark recommended active back exercise, walking, swimming, and weight loss to alleviate Plaintiff's back pain. (*Id.*) Dr. Clark noted that Plaintiff had gastrointestinal bleeding in the past and recommended Tylenol for pain. (*Id.*)

8. On June 18, 1997, Plaintiff was treated for chills and fever secondary to taking Percocet. (R. at 131.) Dr. William Reed, M.D. determined that Plaintiff had an allergic reaction to Percocet, and recommended that he stop taking the drug. (*Id.*) On September 18, 1997, Plaintiff presented to the emergency room complaining that he was having trouble swallowing secondary to a dry mouth. (R. at 130.) Plaintiff improved with drinking water and was advised to follow up with his primary care physician. (*Id.*) On September 26, 1997, Dr. Lourdes Irizarry, M.D. noted that Plaintiff's blood pressure and sugar levels were elevated. (R. at 129.)

4

9.     On October 21, 1997, Dr. Phillip Zinser, M.D. noted that Plaintiff complained of nausea and gagging unrelated to coughing. (R. at 127.)  On November 4, 1997, Plaintiff's glucose levels were lower, but his cholesterol was still high. (R. at 126.)  Dr. Zinser started Plaintiff on Lorsartan. (*Id.*)  On November 26, 1997, Plaintiff had lost weight and had more energy. (R. at 125.)  His diabetes control was improved. (*Id.*)

10.     On December 17, 1997, Dr. Irizarry referred Plaintiff to the VA podiatry clinic for treatment of an ingrown toenail. (R. at 124.)  On January 13, 20, and 29, 1998, the VA podiatry clinic treated Plaintiff for an ingrown toe nail his left big toe. (R. at 121-123.)  On January 29, 1998, the toe was healing well and Plaintiff was instructed to continue soaking his foot in a betadine solution. (R. at 121.)

11.     On February 10, 1998, Dr. Zinser wrote that Plaintiff's HIV level was undetectable on his the ddc/3tc/Indinavir combination of drugs. (R. at 119.)  Dr. Zinser noted that Plaintiff had the following problems: HIV, high LDL and triglycerides, GERD (gastroesophageal reflux disease), and anxiety/insomnia. (*Id.*)  Plaintiff's LDL and triglyceride levels were elevated, but his GERD was stable with Lansoprazole. (*Id.*)  Plaintiff required three shots of vodka to go to sleep. (*Id.*)  Dr. Zinser prescribed Trazadone to help Plaintiff sleep and Lovastatin for his high cholesterol. (*Id.*)  Dr. Zinser also planned to talk to the dietician about weight loss goals for Plaintiff. (*Id.*)

12.     On April 21, 1998, Plaintiff's GERD and insomnia was resolved due to his medications. (R. at 115.)  Dr. Zinser noted that Plaintiff's lipid levels were still high. (*Id.*)  Plaintiff reported burning in his lower legs not necessarily associated with edema and left chest pain radiating into his right arm. (*Id.*)  Plaintiff was referred to the podiatry clinic. (*Id.*)

13.     An April 30, 1998 EKG indicated a low aerobic work capacity and ischemia. (R. at

145.) The final interpretation was positive submaximal exercise tolerance test diagnostic for ischemia with decreased sensitivity in adequate heart rate response. (*Id.*) On May 19, 1998, Plaintiff was diagnosed with accelerating angina. (R. at 104.) Plaintiff's HIV viral load was undetectable. (*Id.*)

14. Plaintiff underwent cardiac catherization at the VA on May 21, 1998. (R. at 101-102.) The results showed minor proximal left anterior descending artery irregularities, mildly diffusely diseased left anterior descending artery, and minor irregularities in the coronary artery. (R. at 102.) Plaintiff's condition was not amenable to stenting, (R. at 111), and he was started on a nitroglycerine patch and his Felodipine was continued. (R. at 102.)

15. On May 26, 1998, Dr. Zinser noted that Plaintiff tolerated the nitroglycerine patch for seven hours a day before he experienced skin irritation and suggested that Plaintiff move the patch around to different sites. (R. at 111.) Plaintiff had chest heaviness about an hour after removing the patch and continued to have sharp shooting pain about three times a day. (*Id.*) Otherwise, Plaintiff felt good and had resumed his diabetes medications. (*Id.*) On May 29, 1998, Lisa Jessup at the VA nutrition clinic reviewed the parameters for a heart-healthy diet with Plaintiff. (R. at 110.) Plaintiff's lipid levels remained elevated. (*Id.*) On June 16, 1998, Dr. Zinser noted that Plaintiff continued to have angina, but less frequently with the nitroglycerine patch. (R. at 109.) Plaintiff reported weight loss and fatigue. (*Id.*) He was able to walk the two blocks to and from his home to the VA Hospital. (*Id.*) On June 28, 1998, Dr. Zinser noted that Plaintiff's triglycerides were over 500 and his Lovastatin was increased. (R. at 107.)

16. On June 21, 1998, Plaintiff stated on an HIV/AIDS functional capacity report that he suffered from occasional respiratory problems, daily shortness of breath, occasionally coughed, choked, had bouts of pneumonia and that any exertion caused chest pains and headaches. (R. at 81.)

6

He stated that he could walk for zero hours, stand for one hour, and sit for three hours before he needed to rest. (R. at 82.) Plaintiff further stated that he could occasionally bend, lift a maximum of ten pounds, and occasionally reach. (*Id*.) He needed to nap twice a day for two hours and suffered from fatigue, sudden diarrhea, nausea, headaches and chills. (*Id*.) He frequently experienced night sweats, fevers, and his sleep was impaired. (R. at 83.) Plaintiff further reported that he had swelling of lower limbs, neuropathy, frequent backaches, dry mouth and gagging spells, and constant ear ringing (*Id*.) On a June 21, 1998 agency form, Plaintiff reported that he frequently suffered from anxiety and confusion, that his short term memory failed him frequently and that he had difficulty with memory, concentration and orientation. (R. at 91.)

17. On September 16, 1998, Dr. Rayme L. Romanik, M.D., an agency physician, completed a medical assessment form and determined that a sedentary or light residual functional capacity was consistent with Plaintiff's medical record. (R. at 162.) Dr. Romanik considered Plaintiff's assertion that he had "full-blown AIDS," but concluded that there was no medical evidence to suggest that he had an "opportunistic infection, malignancy or other listed (14.08) impairment." (*Id.*)

18. On September 19, 1998, Dr. Aida Recalde, M.D., an agency medical consultant, opined on a residual functional capacity assessment form that Plaintiff could occasionally lift up to twenty pounds, frequently lift up to ten pounds, stand or walk for at least two hours in an eight hour work day, sit about six hours of a normal work day, and had unlimited ability to push and pull. (R. at 154.) Dr. Recalde found no postural, manipulative, visual, communicative, or environmental limitations. (R. at 155-157.) On December 29, 1998, Dr. Melvin L. Golish, M.D. concurred with Dr. Recalde's findings. (R. at 160.)

19. Plaintiff continued to receive treatment at the VA to manage his HIV, chest pain, diabetes and cholesterol after his Social Security disability insured status expired in June 1998. (R. at 170-236.) On May 11, 1999, Plaintiff reported that he had "been feeling real fatigue." (R. at 224.) On January 7, 1999, Plaintiff reported the he developed nausea and "dry heaves" with exertional angina. (R. at 218.)

20. In January 15, 1999, Don Viets, MSW and LISW, noted that Plaintiff's partner had died three months before. (R. at 214.) Plaintiff was very anxious about his own condition and felt fatigued. (*Id.*) Plaintiff reported that he was unmotivated, watched TV, went for half hour walks, and described the rest of his time was a "void." (*Id.*) Plaintiff was diagnosed with major depression and complicated bereavement. (R. at 215.) He was prescribed Zoloft and continued counseling. (R. at 215-216.) Mr. Viets noted that Plaintiff had good verbal and cognitive skills. (R. at 216.)

21. On March 18, 1999, Plaintiff was without GERD or dyspeptic symptoms. (R. at 213.) Plaintiff was taking Zoloft and was feeling much better. (R. at 214.) On April 17, 1999, Dr. John D. Carey, M.D. referred to Plaintiff's coronary artery disease as "mild." (R. at 202.) On that day, Plaintiff reported that he suffered two episodes of syncope while walking to the VA hospital. (*Id.*) Plaintiff's CD4 count was 640 and his viral load was undetectable.[2] (R. at 203.) Plaintiff was monitored overnight and myocardial infarction was ruled out. (R. at 204.) The incident was attributed to vasovagal syncope due to Plaintiff's participation in an Interleukin II study. (*Id.*)

22. On July 26, 1999, Plaintiff reported that he was able to walk about a half a mile without symptoms and denied that he suffered from GERD. (R. at 191.) On October 1, 1999,

---

[2] Normal CD4 counts are about 750, plus or minus 250. MERCK MANUAL 1314 (17th ed. 1999).

Plaintiff reported he suffered a sever episode of chest pain while he was mopping his floor two weeks previously. (R. at 195.)

23. On September 29, 1999, Plaintiff's vision was evaluated after he complained that he had a "veil" in his vision for the prior year. (R. at 164; 168.) Plaintiff had 20/30 corrected vision in both eyes, full visual field, and a mild sclerotic cataract in his left eye. (R. at 164.) Dr. Kathy Halverson, M.D. determined that the vision complaints were non-ocular in etiology and possibly due to side effects from Plaintiff's medications and that the condition should be monitored yearly. (R. at 168.)

24. On February 7, 2000, Dr. G.T. Davis, M.D. performed a consultative examination. (R. at 237-244.) Plaintiff reported that in 1995 he could not continue working because he was having blackouts and a lot of dental surgery. (R. at 237.) Plaintiff received a VA disability pension at about that time. (R. at 238.) Plaintiff stated that he had a heart attack in 1998. (R. at 238.) Plaintiff reported that if he tried to walk too quickly or walked a far distance, he experienced chest pain that responded to nitroglycerine or resolved on its own. (*Id*.) Plaintiff reported that he was fatigued all the time and that taking a shower made him feel tired and could cause chest pain. (*Id*.) Plaintiff planned to start a cardiac rehabilitation program at the VA. (*Id*.)

25. Plaintiff reported to Dr. Davis that he had been diagnosed with HIV in 1991. (R. at 238.) His CD4 count had dropped to 120 at one point, but at the time of the evaluation it was up to 800. (*Id*.) Plaintiff reported that he was not having problems with HIV except for fatigue. (*Id*.) Plaintiff recounted that he was diagnosed with diabetes in 1995. (R. at 238-239.) Although he was taking Glyburide and Metformin, his blood sugars were still too high and he was undergoing additional treatment and testing at the VA. (R. at 239.) Plaintiff explained that in 1996, he developed

9

neuropathy in his lower extremities and that periodically he had a "pins and needles" sensation or a burning pain in his feet and between his fingers. (*Id*.) Plaintiff also complained to Dr. Davis of headaches, dizziness, nausea, diarrhea, chest pains, leg pains, fatigue and confusion. (R. at 239.) Plaintiff lived alone and was able to cook for himself, but had a home health care worker come in to do household chores. (*Id*.)

26. On examination, corrected vision was 20/25 on the right, and 20/40 on the left. (*Id*.) Hearing and speech were intact. (*Id*.) Balance and gait were normal. (*Id*.) Plaintiff could walk on his toes and squat down. (*Id*.) Limb measurements were symmetrical without atrophy. (*Id*.) Chest was clear, heart beat was regular without gallop or murmur. (*Id*.) Distal pulses were intact. (*Id*.) There was no liver enlargement or jugular venous distention, and no peripheral edema. (*Id*.) Abdominal examination revealed obesity, but no organomegaly, acites or jaundice. (*Id*.)

27. Plaintiff exhibited good mobility in the neck, middle back, and lower back. (R. at 239.) Seated straight leg raising was negative. (*Id*.) Plaintiff had a good range of motion in his upper and lower extremities, and motor and sensory functions were normal. (*Id*.) There were no infections in his mouth, lymphatic nodes were not enlarged, and there were no obvious skin lesions. (*Id*.) Dr. Davis opined that Plaintiff may have some limitation in terms of forceful exertion or strenuous activities, and recommended that he avoid extremes in temperature. (R. at 240.)

28. At the October 20, 1999 evidentiary hearing, Plaintiff appeared and was represented by Armando Cordova, a non-attorney. (R. at 20.) Plaintiff testified that he had a heart condition and high cholesterol and that when he exerted himself he experienced headaches, dizziness and nausea due to taking Atenol, a beta blocker. (R. at 26.) He had been a diabetic for four years and was non-insulin dependent. (R. at 27.) Plaintiff's diabetes caused fatigue, bone and body aches. (*Id*.) He had

10

neuropathy in his legs and feet and that some days he could hardly walk. (*Id.*) Plaintiff also took a lot of medication and sometimes had shingles and diarrhea. (R. at 28.)

29. Plaintiff testified that his thinking was unclear due to his medications and that he gave up driving. (R. at 28.) He had cataracts in his left eye, progressive vesicle deterioration, and detached retinas. (R. at 29.) Plaintiff he had "a lot of depression" on a daily basis. (*Id.*) He did not have much of an appetite and mostly ate chicken. (*Id.*) Plaintiff did not sleep well. (R. at 29-30.) He did not socialize and mostly stayed home. (R. at 30.)

30. Plaintiff had a home health care worker who did his grocery shopping and cleaning. (R. at 30-31.) Plaintiff testified that it was hard for him to go into grocery stores due to the bright lights and his vasovagal disorder. (R. at 31.) Plaintiff was no longer on Interleukin, but was taking the protease cocktail medications. (R. at 32.) Plaintiff's doctors had told him to stop drinking alcohol and put him on so much medication that he was unable to drink. (R. at 34.)

31. Leroy Zika, Plaintiff's home health care worker, testified that he cleaned Plaintiff's home, shopped for his groceries, and did his laundry. (R. at 36.) Mr. Zika also drove Plaintiff where ever he had to go. (*Id.*) Mr. Zika testified that Plaintiff was very exhausted when he arrived and sometimes had difficulty walking from room to room. (R. at 37.) Mr. Zika did not believe that Plaintiff had the ability to appear for work on a regular, full-time basis. (*Id.*) Mr. Zika also agreed that Plaintiff was the same way as he was at the hearing, which the ALJ characterized as not very focused. (R. at 38.)

**Discussion**

32. Plaintiff contends that the ALJ erred by failing to consider and comment upon relevant medical evidence, the ALJ failed to consider the combined effect of all of Plaintiff's medical

11

conditions and impairments, the ALJ erred in his credibility determination, and the ALJ erred in applying the grids in light of Plaintiff's chronic back pain and anxiety.

33. Plaintiff asserts that the ALJ failed to consider his anxiety, chronic backache, GERD, and his gagging, inability to swallow and speech impairment. The ALJ considered the combination of Plaintiff's health problems, but noted that the record contained very few medical records contemporaneous to the date he was last insured. The following is a summary of the medical evidence with respect to these four conditions. The record contains no reference to anxiety other than Plaintiff's own statements that he was anxious on occasion. (R. at 83, 119 and 137.) Plaintiff was not referred for, and did not receive, any mental health treatment until January 1999. (R. at 214.)

34. On January 8, 1997, Plaintiff complained of back pain, problems walking and getting out of chairs. (R. at 141.) Dr. Clark found that Plaintiff's gait was normal, his Rhomberg signs were negative and his range of motion at waist was good. (*Id.*) Plaintiff appeared stiff standing up and had mild back discomfort. (*Id.*) An MRI revealed hypertrophy in spine at C3-C4 and C4-C5 with neuroforminal narrowing and disc space loss at L4-L5, L5-S. (*Id.*) Dr. Clark recommended active back exercises, walking, swimming, and weight loss to alleviate the back pain. (*Id.*) Dr. Clark noted that Plaintiff had gastrointestinal bleeding in the past and recommended Tylenol for pain. (*Id.*) The record does not indicate that Plaintiff received any additional treatment for a back condition.

35. On February 10, 1998, Dr. Zinser noted that Plaintiff's GERD was stable with Lansoprazole. (*Id.*) On April 21, 1998, Plaintiff's GERD was resolved due to his medications. (R. at 115.) On March 18, 1999, well after his disability insured status expired, Plaintiff was without GERD or dyspeptic symptoms. (R. at 213.) On July 26, 1999, Plaintiff denied that he suffered from GERD. (R. at 191.)

36. On September 18, 1997, Plaintiff presented to the emergency room complaining that he was having trouble swallowing secondary to dry mouth. (R. at 130.) Plaintiff improved with drinking water and was advised to follow up with his primary care physician. (*Id*.) On October 21, 1997, Plaintiff complained of nausea and gagging unrelated to coughing. (R. at 127.) The record does not indicate that Plaintiff suffered from a speech impediment that would interfere with his ability to perform substantial gainful activity. The record does not document that gagging and difficulty swallowing was a continuing problem during the relevant period or that this condition had any impact on Plaintiff's ability to perform work-related activities.

37. The record establishes that Plaintiff's complaints of anxiety, back problems, GERD, and difficulty with gagging, swallowing, or speaking were non-severe impairments that did not impact Plaintiff's ability to perform work related activities. The ALJ's inquiry is limited to the extent a condition prevents a plaintiff from maintaining regular employment. *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988). There is no evidence that Plaintiff's anxiety, backache, GERD, or gagging problem prevented him from performing work-related activities. The ALJ's finding that Plaintiff's only severe impairments were HIV infection, coronary artery disease and diabetes is supported by substantial evidence and the ALJ applied correct legal standards.

38. Plaintiff contends that the ALJ failed to consider the combined effect of all of Plaintiff's medical conditions and impairments. This contention is without merit. The ALJ reviewed the medical records and determined that Plaintiff had the severe impairments of HIV infection, coronary artery disease, and diabetes. (R. at 11-12.) The ALJ recognized that Plaintiff had a "combination of impairments that must be evaluated" and went on to evaluate all of his severe impairments. (R. at 12-13.) In his conclusions, the ALJ explicitly stated that Plaintiff had a

13

"combination of impairments" that were considered severe under the regulations. (R. at 15.) The ALJ reviewed all the evidence and considered the entire record in assessing Plaintiff's condition, (R. at 11-13), and correctly considered all of Plaintiff's impairments in combination.

39. Plaintiff asserts that the ALJ erred in his credibility determination. The ALJ's determination of credibility is afforded special deference. *Williams v. Bowen*, 844 F. 2d 748, 750 (10th Cir.1988) In making his credibility determination, the ALJ discussed that Dr. Davis' consultative examination revealed no major clinical abnormalities. (R. at 13.) Dr. Davis opined that Plaintiff may have some limitation in terms of forceful exertion or strenuous activities and recommended that he avoid extremes in temperature. (R. at 240.) The ALJ is entitled to examine the medical record and evaluate a claimant's credibility to determine whether a claimant's pain is so severe as to preclude any substantial gainful employment. *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir.1990). The ALJ properly considered Dr. Davis' report in assessing Plaintiff's credibility.

40. The ALJ also observed that two non-examining agency physicians, Dr. Recalde and Dr. Golish, concurred that Plaintiff retained a residual functional capacity consistent with the exertional requirements of sedentary work. (R. at 13; 154-160.) The record further establishes that Plaintiff was able to walk the several blocks to the VA hospital from his home and back and the treating physicians at the VA did not state that Plaintiff was restricted from daily activities. The ALJ found that Plaintiff's testimony that he was unable to perform any work related activities is inconsistent with the record as a whole and therefore lacks credibility. Accordingly, the ALJ's finding that Plaintiff was not fully credible is supported by substantial evidence.

41. Plaintiff argues that the ALJ erred in applying the grids in light of Plaintiff's chronic back pain and anxiety and that the ALJ should have consulted a vocational expert. After determining

14

that Plaintiff was unable to perform his past relevant work, the ALJ proceeded to step five and found that the Grids[3] directed a finding the Plaintiff was not disabled. (R. at 14.) At step five, the burden of proof shifts to the Commissioner to show that the claimant retains the residual functional capacity to do work which exists in the national economy. *Thompson v. Sullivan*, 987 F. 2d 1482, 1487 (10th Cir. 1993). In certain cases, at the fifth step, the ALJ may rely solely on the Grids.

42. The Grids assume that a claimant's sole limitation is lack of strength, also known as an exertional impairment. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2). In a case such as this, where a claimant presents evidence of both exertional and non-exertional impairments, the ALJ must make findings on how much a claimant's work ability is further diminished by the non-exertional limitations. *Id.* If the non-exertional limitations are significant enough to further reduce work capacity, the ALJ may not rely solely on the Grids but must instead give full consideration to all relevant facts, including expert vocational testimony if necessary, in order to determine whether a claimant is disabled. *See Channel v. Heckler*, 747 F. 2d 577, 583 (10th Cir. 1984). In assessing the extent to which a claimant's ability to work is eroded by his non-exertional impairments, the ALJ will normally need to obtain the testimony of a vocational expert. *See Hargis v. Sullivan*, 945 F. 2d 1482, 1491 (10th Cir. 1991).

43. The ALJ did not consult vocational expert, but relied on the Grids at step five, after he determined that Plaintiff had the residual functional capacity for sedentary work which was not limited by non-exertional impairments. (R. at 13-15.) This determination is supported by substantial evidence. Because Plaintiff's non- exertional impairments did not restrict him from performing the full range of sedentary work, the Grids satisfied the Commissioner's burden at step five. *See Glass*

---

[3] 20 C.F.R. Part 404, Subpt. P, App. 2, §200.00 (e)(2).

*v. Shalala*, 43 F.3d 1392, 1396 (10th Cir.1994). A vocational expert was not required in this case because the ALJ found that Plaintiff was able to perform the full range of sedentary work. Thus, the ALJ properly relied on the Grids to meet the Commissioner's burden at step five.

44. The Commissioner's decision that Plaintiff is not disabled at step five is supported by substantial evidence and is in accordance with the law.

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 6), filed February 1, 2002, be **DENIED.**

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102, written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**